UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REBECCA J. ROUSE,                    )
                                     )
            Plaintiff,               )
                                     )
      vs.                            )      Case No. 4:15-CV-466-CEJ
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.      Procedural History

On December 27, 2010, plaintiff Rebecca J. Rouse filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401, *et seq.*, with an alleged onset date of February 1, 2005, later amended to June 20, 2006.  (Tr. 168–71, 182–84)  On September 8, 2011, plaintiff's application was approved on initial consideration.  (Tr. 86–94)  On April 24, 2012, however, the Appeals Council vacated the order approving benefits and remanded for further proceedings before an Administrative Law Judge (ALJ), without objection from plaintiff.  (99–103, 239)  Plaintiff then requested a hearing before the ALJ.  (Tr. 140–46)  Plaintiff and counsel appeared for a hearing on September 19, 2012.  (Tr. 36–68)  That same day plaintiff amended her alleged onset date to October 27, 2009.  (Tr. 181)  On July 23, 2013, the ALJ issued a decision denying plaintiff's application.  (Tr. 10–30)  Plaintiff requested the Appeals Council reverse the ALJ's decision and award benefits or remand for a new hearing.  (Tr. 5–9)  The Appeals Council denied

plaintiff's request for review on January 7, 2015.  (Tr. 1–3)  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In a disability report, plaintiff stated that the following medical conditions limit her ability to work: depression, neuropathy, "numbness" following neck surgery, diabetes, and carpal tunnel syndrome in both hands.  (Tr. 186)  Plaintiff reported taking or having taken several medications: Gabapentin (Neurontin), Humalog, Januvia, Lamotrigine (Lamictal), Metformin, and NovoLog, for diabetes and diabetic neuropathy; Lisinopril and Quinapril, for high blood pressure; Atorvastatin, Simvastatin (Zocor), and Lovaza (Omega 3 Fish Oil), for high cholesterol; and Aripiprazole (Abilify), Bupropion (Wellbutrin), Fluoxetine (Prozac), Risperidone (Risperdal), Trazodone, and Venlafaxine (Effexor), for anxiety and depression.  (Tr. 243–44)

Plaintiff last worked in January 2005, and all of her past relevant work was as a receptionist at various hospitals and other medical facilities.  (Tr. 186)  In that role plaintiff indicated that she spent much of her time answering phones and performing data entry, which required her to stand or walk for up to one hour per day and to sit for seven hours per day while she was writing, typing, or handling small objects.  (Tr. 221–23)

Plaintiff completed a function report on February 10, 2011, in which she described her daily routine as follows: "Fix breakfast, do laundry, watch T.V., shower[,] let out dogs, fix lunch, dinner[,] brush teeth[,] cleanse face[,] go to bed." (Tr. 205)  She alleged her conditions prevent her from lifting, sitting for a "long

time," standing for a "long time," and taking "long walks."  (Tr. 206)  Plaintiff also reported difficulty concentrating, difficulty with her memory, and anxiousness when she sleeps.  *Id.*

Plaintiff reported that she had no trouble with personal care or grooming.  *Id.* She reported spending one to two hours between three and five times per week cleaning and doing laundry, which she had no difficulty remembering to do.  (Tr. 207)  She leaves the house "often," and she has no difficulty driving herself or traveling alone.  (Tr. 208)  She shops for groceries, clothes, personal care items, medications, and other items between one and two times each week, for one or two hours.  *Id.*  She is able to manage her own finances.  (Tr. 208–09)

Her hobbies include reading, watching movies, listening to music, and spending time with her family.  (Tr. 209)  Since the onset of her medical conditions, plaintiff indicated that her ability to do those activities remains "excellent" and has not been affected by her impairments.  *Id.*  Plaintiff "often" attends church, "sports events," and counseling session.  *Id.*  She talks on the phone and goes out to dinner, plays or movies.  *Id.*  She indicated she has no problems getting along with family, friends, neighbors, or others.  (Tr. 210)  The only reported change in her social activities since the onset of her conditions is that she no longer goes on walks with friends.  *Id*.

Plaintiff reported that her medical problems affect her ability to lift, sit, stand, and use her hands; they impair her memory, concentration, and ability to understand; and she has difficulty completing tasks and following instructions.  *Id.* However, her impairments do not affect her ability to squat, bend, kneel, climb stairs, reach, hear, see, talk, get along with others, or walk.  *Id.*  Plaintiff's

narrative description of her symptoms was as follows: "[I] can't lift more than 20 [pounds], can't sit or stand for about 1 [hour,] [have] difficulty remembering instruction[s], [and experience a] lack of concentration." *Id.* She reported being able to walk one mile before needing to rest for fifteen minutes. *Id.*

Plaintiff additionally indicated that she completes tasks that she begins, even though she cannot pay attention for long periods and she does not follow written or spoken instructions well. *Id.* She has never been fired or laid off from a job because of problems getting along with other people. (Tr. 213) However, she noted that she does not handle stress or tolerate changes in her routine very well. *Id.* When plaintiff is nervous she sometimes "picks" at her skin. *Id.*

On February 10, 2011, plaintiff's daughter completed a third-party function report supporting plaintiff's application for benefits. (Tr. 196) The two of them "eat together, watch television, and relax." *Id.* Plaintiff is responsible for letting the family dog outside and "sometimes" giving the dog medication for seizures. (Tr. 197) According to the daughter, plaintiff's medical conditions affect her ability to "sit for long periods of time or stand for long periods of time," to "take long walks, work with her hands," or perform "yard work." *Id.* Additionally, plaintiff's sleep is affected by her anxiety. *Id.* Plaintiff does not need reminders to care for her personal needs or grooming, or to take her medications. (Tr. 198) She is able to prepare her own meals, clean, and do laundry, all without encouragement. *Id.*

Plaintiff shops both in stores and online, purchasing groceries, necessities, and gifts for others for about an hour, once per week. *Id.* Plaintiff's daughter also reported that plaintiff is able to pay her own bills, count change, use a checkbook, and handle a savings account on her own. *Id.* Her ability to perform those actions

has not been affected by her conditions. (Tr. 200) According to her daughter, plaintiff does not have problems getting along with family members or other people. *Id.*

The daughter also reported that plaintiff's conditions limit her ability to lift, sit, stand, use her hands, complete tasks, concentrate, and remember things. (Tr. 201) However, her conditions do not impair her ability to climb stairs, squat, kneel, bend, reach, walk, talk, hear, or see; nor do her conditions affect her ability to understand, get along with others, or follow instructions. *Id.* Plaintiff's daughter reported that plaintiff, "can't sit or stand for more than 30–60 min[utes] at a time, can't lift more than around 20–25 [pounds], [and] seems to have task completion/memory/concentration issues." *Id.* Plaintiff does not follow written or spoken instructions well, and she can pay attention for only "several minutes." *Id.* Further, plaintiff "does not handle" stress "well" and she "gets very anxious," "sometimes" becoming "aggravate[d]" by changes in her routine. (Tr. 202)

## B. Testimony at the Hearing

The ALJ conducted a hearing on September 19, 2012, which plaintiff and her counsel attended. (Tr. 36–68) Plaintiff's counsel stated that plaintiff was disabled by a combination of mental health problems (major depressive disorder) and physical problems (low back and neck issues, diabetes with neuropathy, and carpal tunnel syndrome). Counsel did not believe that any of plaintiff's conditions met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 44) On the day of the hearing, plaintiff amended her onset date to October 27, 2009, her fiftieth birthday, a date that counsel said,

"pretty much coincides with a point in time when her diabetic neuropathy really kicked in" and plaintiff's "other physical symptoms [also] kicked in."  (Tr. 44–46)

At the time of the hearing, plaintiff was 52 years old, she was 5'6" tall, and weighed 170 pounds, which was "pretty much" her "normal weight."  (Tr. 46)  She was not receiving workers compensation or unemployment benefits at that time.  *Id.*  Plaintiff drives "about twice a week," explaining that she does not drive more frequently because her "lower back hurts" and she "gets numbness in" her "thighs and then" has "neuropathy," including "shooting pains."  (Tr. 47)

Plaintiff testified that she completed "[p]robably a year" of community college classes after high school, during which time she was working toward becoming a physical therapist.  She did not complete a degree or certificate.  *Id.*  She had not received other vocational training, did not serve in the military, and was not working on the date of the hearing.  (Tr. 47–48)  Plaintiff last worked in 2006, as a hospital receptionist.  (Tr. 48)  In that position, which she held for approximately three years, she primarily worked from a seated position and was responsible for answering phones, data entry, and "deal[ing] with the public."  *Id.*  According to plaintiff, the hospital contends she was "laid off," but plaintiff thinks she "got fired."  *Id.*  Before that job, plaintiff held receptionist positions at several other medical centers, two of which she left because her supervisors told her she "wasn't doing good" or "wasn't productive."  (Tr. 49)

Plaintiff testified that her "mental and physical" conditions prevent her from working.  (Tr. 50)  Specifically, she cited her "back and neuropathy" and that her "neck and shoulders hurt."  *Id.*  Her neuropathy affects her daily, all day, and is "primarily in the calf of [her] leg and [in her] feet," which manifests as "numbness,

tingling," and "shooting pains in the calf of [her] leg."  (Tr. 63)  Plaintiff also explained that, though she had surgery on both wrists for carpal tunnel syndrome, the surgical intervention helped "for like six months and then now [she] ha[s] a hard time gripping and [wi]ll get shooting pains" on the back of her dominant, right hand.  (Tr. 50)  Her ability to use a keyboard or write with a pen is "limited" to "[m]aybe an hour."  (Tr. 62)

Plaintiff also had two back surgeries, one for spinal stenosis, in 2006, and the other for a herniated disk, in 2011.  (Tr. 51–53)  According to plaintiff, the 2011 back surgery helped "for like three or four months" after which "it's start[ed] to hurt again."  (Tr. 53)  Plaintiff testified that she has trouble standing and walking; she "can only stand on [her] feet [for] maybe an hour" before her "back and [her] legs start hurting."  *Id.*  She also indicated "trouble sitting," testifying that she can sit for "[m]aybe two hours, three hours," after which she will "lie down."  (Tr. 53–54, 64)  Plaintiff also testified that she cannot rotate her neck to look behind her in either direction without pain.  (Tr. 64–65)

Plaintiff was taking Prozac, Wellbutrin, and Trazodone on the date of the hearing.  She had been prescribed various anti-depression medications since at least 2003, having "struggl[ed] with" depression for eighteen years.  (Tr. 55, 57)  She testified that she had at one point been prescribed a different medication for depression, but her physician "switched" her prescription because she was "having a hard time" and was "more moody," and was particularly "having a hard time around people."  (Tr. 55)

Plaintiff also testified to getting "confused" and being unable to concentrate when she reads.  *Id.*  Though she could have sat for eight hours a day while

working as a receptionist in 2005, she testified that could not have done so in 2011 because of her back, neuropathy, neck, and shoulders. (Tr. 56) Additionally, plaintiff testified that her depression would have affected her ability to work as a receptionist in 2011 because she can't concentrate or focus, and she becomes lvery flustered. (Tr. 57) When working in 2006, she had anxiety attacks requiring her to go into another room. *Id.*

Plaintiff testified that she is sometimes moody and tends to isolate herself. *Id.* Perhaps once a week, she goes to bed crying and stays in bed all day because of stress. (Tr. 58) Plaintiff also testified that she "pick[s] at" her skin, causing red marks. *Id.* She doesn't do this as much as she used to, but it just depends on her stress level. (Tr. 59) About once a month plaintiff has panic attacks lasting two or three minutes and has crying spells, sometimes lasting from one to two hours, about three times a week. *Id.* Additionally, plaintiff testified that she has a few friends, but most of the time she is uncomfortable being around people. (Tr. 59–60)

Dale Thomas, a vocational expert, testified at the hearing that plaintiff's past relevant work as a receptionist qualifies as a sedentary, semiskilled position. (Tr. 67) Thomas also testified that a person who is limited to performing simple, repetitive tasks could not perform the job of a receptionist, because that position requires a "greater skill level." *Id.* The record was left open, among other things, for Thomas to submit testimony regarding the employment opportunities available in the national economy for an individual of plaintiff's age, education, past relevant work, and Residual Functional Capacity (RFC). *Id.*

On January 15, 2013, Thomas submitted an interrogatory response stating that plaintiff also had past relevant work as a deli worker. (Tr. 255) The vocational expert additionally opined that a hypothetical individual with plaintiff's RFC would be qualified to perform plaintiff's past relevant work as a receptionist. (Tr. 256) Further, given plaintiff's age, education, past relevant work, and RFC, such a person could work in unskilled positions as a domestic laundry worker or cashier II, both jobs that exist in significant numbers in the national economy. (Tr. 257) The vocational expert also opined that no conflict exists between the limitations in the hypothetical posed by the ALJ and the requirements necessary to perform work as a domestic laundry worker or cashier II as those jobs are defined in the *Dictionary of Occupational Titles* (DOT) and its companion publication, the *Selected Characteristics of Occupations Defined* (SCO). (Tr. 258)

## C. Medical Records

### 1. Before the Alleged Onset Date

As early as September 14, 2005, when plaintiff was still working, she had unclassified "depressive disorder" and benign hypertension. (Tr. 280) On May 16, 2006, plaintiff's therapist, Scott Arbaugh, M.D., noted that plaintiff was "unemployed due to downsizing" and was "looking for a new job." (Tr. 493) However, her mood was good, her concentration level was "ok," and she was not noted to have any anxiety. *Id.* Most of Dr. Arbaugh's session notes are handwritten and many are illegible.

On November 7, 2006, Peter Yoon, M.D., performed surgery on plaintiff's back for cervical spondylosis at C4-5 and C5-6. (Tr. 523–28) Following that surgery, no changes in plaintiff's medications for "major depression" or acute

findings were noted by Dr. Arbaugh in October or November 2006, or in February or May 2007. (Tr. 486–88) On August 22, 2007, Dr. Arbaugh remarked that plaintiff had a good mood, a good energy level, and that her medications remained the same. (Tr. 485) Dr. Arbaugh again remarked on October 22, 2007, that plaintiff's mood was good, she was sleeping well, and she had a good appetite and energy level, with no anxiety. (Tr. 484) No changes to her medications or course of therapy were indicated. *Id.*

On January 23, 2008, Dr. Arbaugh remarked that plaintiff was "doing very well" in spite of her depression, and she was suffering no anxiety. (Tr. 482) Plaintiff had some anxiety on April 16, 2008, according to Dr. Arbaugh. (Tr. 481) On July 18 and October 24, 2008, however, Dr. Arbaugh remarked that plaintiff's mood and her appetite and energy levels were good, and her anxiety was controlled. (Tr. 479–81)

Jennifer Carpenter, M.D., noted on June 4, 2008, that plaintiff had uncontrolled Type II diabetes and depression, but she was "doing well on present medications." (Tr. 351–52) At that time plaintiff complained of back pain. (Tr. 353) Dr. Carpenter observed that plaintiff appeared healthy, and that she was active, alert, cooperative, sociable, and in no distress. (Tr. 354) Two weeks later, Dr. Carpenter observed that plaintiff's depressive disorder appeared "stable on Prozac and Effexor." (Tr. 366) During the June 18 examination, plaintiff denied having stiff joints, neck pain, back pain, or muscle weakness. (Tr. 369) Dr. Carpenter again remarked that plaintiff was "active, alert, cooperative," "social," and in "no distress." *Id.* Plaintiff was told to follow-up in three months. (Tr. 372)

On September 22, 2008, Dr. Carpenter examined plaintiff and remarked that plaintiff was continuing to see a therapist every 6 months and "no change to [her] med[ications] [was] needed." (Tr. 375) Plaintiff denied suffering from stiff joints, neck pain, back pain, or muscle weakness. (Tr. 377) As with past examinations, she was "active, alert, cooperative," "social," and in "no distress." *Id.* Additionally, plaintiff was not having "gait problems." *Id.* Plaintiff was again told to follow-up in three months. (Tr. 379) Dr. Carpenter made the same findings on December 22, 2008. (Tr. 385) Plaintiff's depression was "stable on Effexor." (Tr. 386)

On February 16, 2009, plaintiff did not complain of, "stiff joints, neck pain, back pain, [or] muscle weakness." (Tr. 393) On January 1 and again on April 15, 2009, plaintiff's mood was assessed as "good" by her therapist. (Tr. 477–78) She had "no recent low mood" and no anxiety. *Id.* No change in her medications for depression and anxiety was ordered. *Id.*

Dr. Carpenter saw plaintiff again on May 18, 2009, at which point plaintiff complained that her feet were swelling related to her diabetes. (Tr. 400) Plaintiff complained of "intermittent swelling near [her] toes accompanied with tingling, [with] no calf pain or swelling." (Tr. 404) She was "active, alert, cooperative, [in] no distress, [and] social." *Id.* Plaintiff's neck was not abnormal. *Id.* On August 19, 2009, plaintiff saw Dr. Carpenter for a follow-up visit related to hypertension. (Tr. 411) Plaintiff was experiencing "neuropathic pain," but she denied "stiff joints, neck pain, back pain, [or] muscle weakness." (Tr. 414)

Dr. Arbaugh remarked on July 27, 2009, that plaintiff remained under a diagnosis of major depression, but she was not then suffering from anxiety. (Tr. 476) During that therapy session, plaintiff's mood and appetite were found to be

"good," and her energy level was "ok." *Id.* Her medications and course of therapy remained the same. *Id.* On October 25, Dr. Arbaugh again observed that plaintiff's mood was "good." (Tr. 475) During the therapy session she talked positively about her recent trip to Hawaii. *Id.* Her appetite level and energy level were "good." *Id.* Though she had some anxiety, Dr. Arbaugh did not elaborate what plaintiff was anxious about. *Id.* Dr. Arbaugh did not prescribe any change in plaintiff's medications or course of therapy. *Id.*

## 2. **During the Coverage Period**

On November 13, 2009, plaintiff was examined by Andrew Kazdan, M.D., for a cough, sore throat, and dry throat. (Tr. 281–82, 418–28) Dr. Kazdan noted that plaintiff recalled suffering from depression and anxiety since the 1990s. (Tr. 281) Plaintiff had had lower back surgery in 2007. (Tr. 281–82) Plaintiff also had hyperlipidemia. *Id.* Dr. Kazdan remarked that plaintiff's diabetes was poorly controlled, and she was taking medication for her diabetic neuropathy, without noted side effects. (Tr. 282) Additionally, plaintiff reported bilateral foot neuropathy for the "past few months," but without sores or signs of claudication. *Id.* Plaintiff told Dr. Kazdan that she was following a 2000 calorie-a-day diabetic diet and was "walking intermittently" for exercise. (Tr. 284)

Dr. Kazdan opined that plaintiff's general appearance was "healthy," and she was "active, alert, cooperative," not in any acute distress, and "social." *Id.* An examination of plaintiff's neck revealed no abnormalities or tenderness. *Id.* Plaintiff's skin was free of rashes and lesions. (Tr. 285) Dr. Kazdan diagnosed plaintiff with uncontrolled Type II diabetes mellitus with neurologic manifestations, benign hypertension, hypertriglyceridemia, and inflammatory and toxic neuropathy.

*Id.*  For plaintiff's diabetes and neuropathy, Dr. Kazdan indicated that plaintiff should continue taking insulin and Metformin.  Dr. Kazdan requested plaintiff return for a follow-up visit in six weeks.  (Tr. 290)  During that visit, plaintiff "denie[d]" "stiff joints, neck pain, back pain," and "muscle weakness.  (Tr. 284)

On December 28, 2009, Dr. Kazdan remarked that plaintiff's diabetes was "poorly controlled, but better."  (Tr. 295)  Plaintiff's inflammatory and toxic neuropathy was ongoing, so Dr. Kazdan prescribed a different insulin, as well as Zocor.  (Tr. 297)  Plaintiff was "active, alert, cooperative, [in] no distress," and was "social."  *Id.*  She also "denie[d]" "stiff joints, neck pain, back pain," and "muscle weakness.  (Tr. 297)

On February 22, 2010, Dr. Arbaugh's session notes indicate plaintiff's mood was "good."  (Tr. 474)  She had a "good" "energy level," despite "some anxiety." *Id.*  No change in her medications or course of therapy was prescribed.  *Id.*

Plaintiff saw Dr. Kazdan on April 6, 2010, for a follow-up appointment.  (Tr. 308)  She had gained ten pounds, which she attributed to the medications.  *Id.* She was "tearful" because her son was getting divorced, and she was upset about her weight gain.  *Id.*  However, plaintiff was "active, alert, cooperative, [in] no distress," and was "social."  *Id.*  During that examination, plaintiff "denie[d]" "stiff joints, neck pain, back pain," and "muscle weakness."  (Tr. 311)  Dr. Kazdan requested plaintiff follow-up with her therapist for "depression," and he prescribed Wellbutrin.  (Tr. 312)

On June 18, 2010, Dr. Arbaugh counseled plaintiff, who was again upset about her son's divorce.  (Tr. 473)  Dr. Arbaugh increased the dosage of plaintiff's

antidepressant medications and requested plaintiff follow up in four months for additional therapy. *Id.*

On September 30, 2010, Dr. Kazdan remarked that plaintiff's diabetes was "slight[ly] better." (Tr. 323) She reported being stressed because her husband was in the hospita. *Id.* Dr. Kazdan opined, however, that plaintiff's depression was, "doing ok." *Id.* Plaintiff reported experiencing "worse" hand numbness in her right hand over the last several weeks, but she was "not dr[o]pping things." *Id.* She denied stiff joints, neck pain, back pain, and muscle weakness at the examination. *Id.* Plaintiff stated that she was exercising by "walking intermittently." *Id.* Her skin and neck were normal. (Tr. 326) Dr. Kazdan reported a positive Tinel's sign result on plaintiff's right hand, indicating tingling, but plaintiff's grip was "ok." *Id.* Plaintiff's feet were "warm" with "good capillary refill" and normal pulses, with slight decrease in "monofilament exam" at the "end[s] of [the] feet." *Id.* Dr. Kazdan diagnosed plaintiff with carpal tunnel syndrome. *Id.*

On November 30, 2010, an MRI was performed on plaintiff's cervical spine. The impressions made by Toni Roth, M.D., were as follows: "Since 2006, there is stable appearance to tiny focal signal abnormality within the cervical cord at the upper C4 level." (Tr. 348, 522) Plaintiff "had anterior fusion from C4 to C6 with mild progression of degenerative spondylosis above and below the fusion particularly at C6-C7[,] where there is significant bilateral right greater than left bony foraminal stenosis." *Id.*

Plaintiff saw Dr. Arbaugh for therapy on December 1 and 3, 2010. (Tr. 472) She was reported experiencing depression and anxiety because she was "scared to

be on her own" and "worri[ed] she can't keep a job" if she continued to have marital difficulties. *Id.* Plaintiff was to follow up in two weeks and to continue the same therapy regimen and medications. *Id.*

Plaintiff saw Dr. Kazdan on December 3, 2010, complaining of "neck pain." (Tr. 332) Her arm remained "unchanged" and Dr. Kazdan noted cervical stenosis, elbow entrapment, and "mild" carpal tunnel syndrome. (Tr. 333) Dr. Kazdan observed that plaintiff's "depressive disorder" was "worse," and she was crying because she "left [her] husband last week." *Id.* During that examination, plaintiff denied stiff joints, neck pain, back pain, and muscle weakness. (Tr. 335) Her neck was not tender; it was normal. *Id.* A Tinel's sign test was again positive in plaintiff's right hand, indicating carpel tunnel syndrome, but her grip was "ok." *Id.*

Dr. Kazdan discussed plaintiff's depression with her and recommended that she follow-up with a therapist, but he prescribed "no med[icine] change[s] for now." *Id.* He also opined that plaintiff had degeneration of the cervical intervertebral disc. *Id.* Dr. Kazdan then made the following notation: "Discussed ongoing outlook for employment, [patient] with brittle [diabetes], neuropathy, difficult to control anxiety and depression, [including] neck pain and issues with [degenerative joint disease], unlikely she will be able to be gainfully employed, advise look at disability." *Id.*

On December 8, 2010, Dr. Yoon wrote a letter to Dr. Kazdan in which he noted plaintiff's "neck pain, shoulder pain," and "bilateral arm pain." (Tr. 279, 530) According to Dr. Yoon, plaintiff's "arm pain bothers her more than the neck." *Id.* She described the pain as tingling in both arms, and "shooting pain" in the neck and shoulders. (Tr. 507) Plaintiff complained to Dr. Yoon of joint pain, weakness in

her muscles or joints, and muscle pain. (Tr. 508) She did not complain of any back pain or difficulty walking. *Id.* She also indicated that she was nervous and depressed, but did not note any memory loss or confusion. *Id.*

Plaintiff's pain had by then been present for six months, and was described as "constant," with numbness in all fingers. (Tr. 279) Dr. Yoon's examination revealed, decreased pinprick sensation in the median nerve distribution. *Id.* MRI results showed a fusion at C-4-5-6 and spondylosis at C6-7 without "evidence for a myelopathy." *Id.* "EMG and nerve conduction studies were consistent with bilateral carpal tunnel syndrome" and "some ulnar neuropathy." (Tr. 279, 530) Dr. Yoon determined the appropriate course of treatment was carpal tunnel release on the right side. *Id.*

Plaintiff next saw Dr. Arbaugh for therapy on December 17, 2010. (Tr. 471) Despite her carpal tunnel condition, her mood was "better." *Id.* She was instructed to again follow up in a few weeks and to continue medications and therapy. *Id.*

After Dr. Yoon performed the carpal tunnel release procedure on January 8, 2011, plaintiff told Dr. Yoon that she was "feeling better" on January 10. (Tr. 510) Before Dr. Yoon performed a carpal tunnel release on plaintiff's left hand, she attended another therapy session with Dr. Arbaugh on January 16. (Tr. 664) She had some anxiety and was more depressed. *Id.* Plaintiff was concerned about gaining weight. *Id.* No change in her course of treatment was prescribed. *Id.* Dr. Yoon recommended a left carpal tunnel release for plaintiff's bilateral carpal tunnel syndrome on January 17, which he then performed. (Tr. 692)

On January 28, 2011, after the procedure, plaintiff had another therapy session with Dr. Arbaugh. (Tr. 470, 670) He observed that plaintiff was doing

"much better" and was getting counseling at her church. *Id.* Plaintiff's sense of self-worth was "better." *Id.* She had separated from her husband. *Id.* Plaintiff had low mood and some anxiety. *Id.* Plaintiff was instructed to continue her medications and therapy; she was to return in six weeks. *Id.*

On February 4, 2011, Dr. Kazdan examined plaintiff and found that her diabetes was "doing slight[ly] better." (Tr. 571) She was participating in counseling for stress relating to her marital situation and "abuse," but her depression was "doing ok." *Id.* Plaintiff was seeing "slow improvement" following the carpal tunnel release procedures. *Id.* She denied experiencing "myalgia, arthralgia, stiff joints, neck pain, back pain, [or] muscle weakness." (Tr. 574) Plaintiff also appeared "healthy" during the examination, and she was "active, alert, cooperative," "social," and "in no distress." *Id.* Her skin and neck were normal. *Id.*

On February 14, 2011, plaintiff saw Dr. Kazdan, complaining of pain in her left chest, shoulder, and back that began after she slipped on ice and fell. (Tr. 578) Dr. Kazdan remarked that plaintiff appeared "alert" and "in no distress." (Tr. 579) She was given a two-week dose of pain medications and was told to return if symptoms worsened or failed to improve. (Tr. 581–82)

Dr. Yoon conducted a post-surgical examination of plaintiff's wrists on February 16, 2011. (Tr. 534, 684) It was Dr. Yoon's opinion that plaintiff's wrists looked "good" and "healed." *Id.* On March 11, plaintiff told Dr. Arbaugh that she was experiencing "some confusion" about once or twice a month, but her mood was "good." (Tr. 669) In response to the "confusion," Dr. Arbaugh reduced plaintiff's

dosage of Prozac. *Id.* When she returned for additional therapy on April 8, plaintiff was experiencing "less" anxiety and her mood was "good." (Tr. 668)

On April 26, 2011, Carlos Jusino-Berrios, M.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment related to plaintiff's psychological conditions. (Tr. 536–53) Dr. Jusino-Berrios determined that plaintiff was suffering from depression and anxiety. (Tr. 539, 541) According to Dr. Jusino-Berrios, these conditions caused mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, and pace, but with no episodes of decompensation. (Tr. 546)

A review of plaintiff's medical records indicated that plaintiff's allegations of major depression were credible, but Dr. Jusino-Berrios opined that plaintiff was, "able to understand, remember[,] and execute simple instructions, able to maintain attention, sustain concentration, persistence, and pace, adapt to changes, and interact adequately with others." (Tr. 548, 552) Plaintiff's records indicated to Dr. Jusino-Berrios that plaintiff would be moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions for "psychosocially based" symptoms. (Tr. 550–51) She would be able to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* According to Dr. Jusino-Berrios, plaintiff's medical records indicated that she was "not significantly limited" in other aspects of understanding and memory, sustained concentration and persistence, social interaction, or adaptation. *Id.*

On May 6, 2011, Dr. Kazdan noted that plaintiff's diabetes was "slight[ly] better" and that plaintiff's "stress issues" were "better," but plaintiff was "upset" that she had gained weight. (Tr. 583, 584) Plaintiff was "doing good" with her depression. *Id.* She denied "myalgia, arthralgia, stiff joints, neck pain, back pain, [and] muscle weakness." (Tr. 587) Plaintiff also appeared "healthy" during the examination, and she was "active, alert, cooperative," "social," "and in no acute distress." *Id.* Her neck and skin were normal. *Id.* An examination of plaintiff's feet showed they were warm, with good capillary refill, normal pulses, and with a "slight" decrease in pin-prick sensation in both feet. *Id.*

On May 24, 2011, Stanley London, M.D., examined plaintiff for complaints "relate[d] to her neck and to her carpal tunnel" syndrome "bilaterally." (Tr. 556) At that time plaintiff complained that her "neck ha[d] been bothering her for about [four] years." *Id.* Further, despite the absence of complaints in many of her other medical records over the years, plaintiff told Dr. London that after her back surgery in November 2006, "[s]he did well for about [six] months and then[] her pain returned." *Id.* Plaintiff reported that the pain was "radiating down both arms to her fingers[,] with some numbness and tingling in her fingers." *Id.*

Dr. London noted that plaintiff had undergone bilateral carpal tunnel release and had "done very well since then with no more pain, no more numbness, except for the pain in her neck and the radicular nature of the pain going down into her fingers." *Id.* Plaintiff told Dr. London that her pain "comes and goes," and that "[w]alking, standing, and sitting are okay." *Id.* She complained of "weakness and motor loss" and "some numbness and tingling in her fingers." *Id.*

Plaintiff's gait was "normal without an assistive device," and her ability to "[h]eel and toe walk[], hop[], squat[], [and] get[] off and on the table [were] good." (Tr. 557) Dr. London performed a "detailed orthopedic and neurological exam[ination]," finding that plaintiff's "[k]nee jerks" and "ankle jerks" were "equal and active, as [were her] biceps, triceps[,] and brachial radialis reflexes." *Id.* Plaintiff was able to "make[] a good fist bilaterally," and her "finger to thumb opposition [was] good." *Id.* She no longer had a positive Tinel's sign result at her wrists. *Id.*

The only area of pain or limited movement Dr. London observed was at plaintiff's neck. *Id.* Dr. London's impression was that plaintiff was status "postop discectomy and fusion in her neck," with "residual degenerative joint disease and bilateral foraminal stenosis." *Id.* Dr. London remarked that plaintiff's left and right grip strength and extremity strength were all five out of five, normal. (Tr. 559) Plaintiff's muscle strength in both legs was also normal. (Tr. 560)

On June 21, 2011, plaintiff saw Dr. Kazdan for pain related to lifting items while moving. (Tr. 600) Her "stress issues" were "doing ok." *Id.* Plaintiff denied "myalgia, arthralgia, stiff joints, neck pain, back pain, [and] muscle weakness." (Tr. 603) Plaintiff also appeared "healthy" during the examination, and she was "active, alert, cooperative, no[t in] distress, social, [and] normally nourished." *Id.* Dr. Kazdan noted that plaintiff's neck was normal. *Id.* He described her "mood" as "stable." *Id.* Plaintiff was told to return for additional pain treatment if her symptoms worsened or failed to improve. (Tr. 603)

On July 7, 2011, plaintiff was treated for back pain. (Tr. 608) Dr. Kazdan opined that plaintiff's stress "issues" were "doing ok." (Tr. 609) Plaintiff

complained of "ache[s] all over" and "moderate" "low[er]" back pain rad[iating] to [her] legs," which she had "difficulty localizing." *Id.* Plaintiff did not appear in distress and was active, alert, cooperative, and social during her examination. (Tr. 612) Her neck was asymptomatic. *Id.* Her skin was normal and her mood was "stable." *Id.*

Dr. Kazdan noted that plaintiff's back was "tender." *Id.* She had edema in her legs, with weakness "due to pain," though her pulse was stable in both legs. *Id.* Dr. Kazdan ordered an x-ray of plaintiff's spine and prescribed a thirty-day supply of pain medications. (Tr. 613, 618) The x-ray revealed the "lumbar vertebral alignment [was] intact without subluxation," the "[v]ertebral heights [were] maintained in size as [were] disc spaces," and there was "minimal endpoint spurring" at L3-L4 and L4-L6, with "mild sclerosis." (Tr. 623) Clinical impressions were that plaintiff had "[m]ild degenerative changes in the lower lumbar spine." *Id.* An MRI of plaintiff's lumbar spine on July 13 showed a "[l]arge central disc herniation with inferior migration at L4-L5," with "stenosis." (Tr. 655)

Dr. Yoon examined plaintiff on July 18, 2011, because she was having "difficulty walking since" she had gone on vacation and had "walked a lot." (Tr. 685, 695) Plaintiff's legs felt weak and were "progressively worsening," with the left leg worse than the right. *Id.* She complained of lower back pain "shooting" into her legs, particularly on the "outside" of her left leg and down to her foot. *Id.* Plaintiff had intermittent numbness in her left foot, which Dr. Yoon attributed to her longstanding diabetic neuropathy. *Id.* She was not then experiencing other numbness or tingling. *Id.* Dr. Yoon recommended a left side discectomy of plaintiff's spine at L4-L5. (Tr. 685, 690–91)

On July 22, 2011, plaintiff saw Dr. Kazdan for clearance prior to back surgery. (Tr. 624) Plaintiff's glucose levels were "stable." (Tr. 625) She complained of severe pain, but she was "in no acute distress" during the examination. (Tr. 628) Her neck and skin were normal. *Id.* Plaintiff's mood was "stable," but her back was "tender" and she needed a walker to ambulate that day. *Id.* Dr. Kazdan diagnosed plaintiff with a "[h]erniated lumbar invertebral disc." (Tr. 629) To alleviate plaintiff's herniated disk, Dr. Yoon performed a microlumbar microdiscectomy on plaintiff's spine at L4 and L5 on July 27, 2011. (Tr. 693–94)

On August 10, 2011, Dr. Yoon observed that plaintiff had no pain relief and persistent pain in her left leg, with difficulty walking. (Tr. 686) An MRI was performed on August 17; it revealed "[p]ostoperative changes of L4-L5 discectomy and L5 hemilaminectomy," and a suggestion of "[l]eft L4-L5 recurrent disc herniation." (Tr. 688–89) A week later, on August 17, plaintiff had a therapy session with Dr. Arbaugh, who noted her recent surgery and opined that her mood was "good." (Tr. 666) She had "mild anxiety." *Id.* Her appetite, sleep, and energy level were all "good." *Id.*

Dr. Yoon remarked on August 24 that plaintiff remained in pain, "with some worsening of the pain," following the July 27 discectomy. (Tr. 699) Plaintiff was at that time in "mild distress" from the pain. *Id.* Her motor strength was a five, and her reflexes were intact. *Id.* Dr. Yoon diagnosed plaintiff with "recurrent disk" herniation on the "left side" at L4-L5, with decreased pinprick sensation at L5 on the left side. *Id.* Dr. Yoon scheduled plaintiff for a re-exploration discectomy, which was performed later that day. (Tr. 700–02)

After the second discectomy, on September 7, 2011, Dr. Yoon remarked that plaintiff said "her preoperative symptoms" of disc herniation had "resolved." (Tr. 703) Though plaintiff complained of neck and shoulder pain, with headaches, she had no other symptoms. *Id.* She denied joint pain and muscle weakness. *Id.* Her spinal range of motion was normal, and her lumbar spine was non-tender, with normal muscle strength and tone. (Tr. 704) Her response to pinprick stimulation was intact in her arms and legs, she had normal reflexes, and she had a "normal gait." *Id.* She was able to "stand without difficulty." *Id.* Dr. Yoon opined that plaintiff: "May return to work without restrictions." *Id.* Dr. Yoon wrote to Dr. Kazdan that day to inform him that plaintiff had "excellent pain relief" post-surgery. (Tr. 705)

On October 10, 2011, plaintiff returned to Dr. Kazdan for whooping cough immunization. (Tr. 634) Plaintiff was "active, alert, cooperative," "social," and "in no acute distress" during that examination. (Tr. 638) Plaintiff's neck and skin were normal. *Id.* Her mood was "stable." *Id.* Dr. Kazdan noted that plaintiff had decreased sensation in the "ends" of "both feet." *Id.* On October 21, plaintiff returned to Dr. Arbaugh for therapy. (Tr. 665) Dr. Arbaugh remarked that plaintiff's mood was "good" and noted that she had been Social Security disability benefits. (Tr. 665)

Plaintiff had a follow-up appointment with Dr. Kazdan related to her diabetes on December 12, 2011. (Tr. 644) Her glucose levels had "improved." (Tr. 645) Dr. Kazdan remarked that plaintiff's depression was "slight[ly] worse" and she was "crying," but her "[b]ack" was "doing better." (Tr. 646–48) Plaintiff was told to return for a follow-up appointment in three months. (Tr. 653)

## 3. **After Coverage Expired**

Additional evidence was submitted for the period after plaintiff's Title II insurance coverage expired on December 31, 2011. (Tr. 232) On January 16, 2012, Dr. Kazdan completed a medical source statement in which he remarked that plaintiff has "inferior spinal stenosis," "diabetes," "neuropathy," "hypertension," and "major depression." (Tr. 661) Dr. Kazdan opined that plaintiff could frequently lift between six and ten pounds and occasionally lift between eleven and twenty-five pounds. *Id.* The physician stated that plaintiff could walk for up to one hour in an eight-hour workday, but continuously for only ten minutes. *Id.* He opined that plaintiff could never push or pull, and that she could only sit for three hours during an eight-hour workday, and only for forty-five minutes at a time. *Id.* Yet, according to Dr. Kazdan, plaintiff is not required to assume a reclining or supine position, nor does she need to "prop up" her legs at any point during the day. *Id.* He also remarked that plaintiff could occasionally bend and reach, frequently handle and finger objects, but never kneel. (Tr. 662) Dr. Kazdan was asked to "list the principal clinical or objective findings which support" the limitations he indicated, but Dr. Kazdan identified no support for his findings. *Id.*

Dr. Kazdan also examined plaintiff that same day, because she "need[ed] a form or letter filled out." (Tr. 713) During that examination, he observed that plaintiff's back was "better," with only occasional pain that limits her mobility. *Id.* Dr. Kazdan reported that plaintiff had "neuropathy issues," which "may be worse" in her "hands," but he did not elaborate on that condition. *Id.* Plaintiff was "alert" and "in no distress" during the examination. *Id.*

Dr. Kazdan opined that plaintiff has "multiple medical problems," "[r]equiring multiple medications," that she has "[b]rittle diabetes" that is "difficult to control," "[w]ith major depress[ion] requiring multiple med[ications] for control." (Tr. 714) The "combination" of the "above" conditions "makes [plaintiff] unable to be gainfully employed," according to Dr. Kazdan. *Id.* Dr. Kazdan submitted a form on August 31, 2012, on which he indicated, without explanation or cited support, that plaintiff's limitations as reported in the medical source statement, "[r]emained the same." (Tr. 697)

On January 27, 2012, plaintiff attended therapy with Dr. Arbaugh. (Tr. 663) Plaintiff's sleep habits were "good," but her mood was "depressed." *Id.* Dr. Arbaugh prescribed an increase in plaintiff's Risperidone prescription and asked her to return to therapy in two-to-three weeks. *Id.* That same day, Dr. Arbaugh completed a medical assessment of plaintiff's psychological conditions as they relate to her ability do work-related activities. (Tr. 671) Dr. Arbaugh opined that plaintiff had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment, and maintain attention and concentration. *Id.* He indicated, however, that plaintiff had poor or no ability to interact with supervisors, deal with work stresses, or function independently. *Id.*

Dr. Arbaugh additionally opined in that medical source statement that plaintiff has a fair ability to understand, remember, and carry out simple instructions. (Tr. 671–72) According to Dr. Arbaugh, plaintiff has poor or no ability to understand, remember, and carry out complex or detailed, but not complex instructions. *Id.* Plaintiff can maintain her personal appearance, but she has poor

or no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability.  (Tr. 672)

Without explanation or citation to any of the records of plaintiff's therapy sessions, Dr. Arbaugh opined that plaintiff's prognosis was "poor."  *Id.*  Dr. Arbaugh was requested to "[d]escribe" in narrative form "any limitations" and to "include the medical/clinical findings that support this assessment," but Dr. Arbaugh included no support for his findings on the form.  *Id.*  Like Dr. Kazdan, on August 31, 2012, Dr. Arbaugh submitted a form on which he indicated, without explanation or cited support, that the limitations described in his medical source statement, "[r]emained the same."  (Tr. 696)

During a therapy session on February 10, 2012, Dr. Arbaugh remarked that plaintiff's mood was "better," and she told Dr. Arbaugh that she, "feel[s] good." (Tr. 708)   Dr. Arbaugh did not report that plaintiff was suffering from any anxiety. *Id.*  Plaintiff had another therapy session with Dr. Arbaugh on April 4, 2012, at which time her mood was "good," as was her appetite, energy level, and sleep pattern.  (Tr. 707)  At that session Dr. Arbaugh did not remark that plaintiff was suffering from anxiety.  *Id.*

On April 27, 2012, Dr. Kazdan examined plaintiff.  (Tr. 718)  In contrast to his remarks of three months prior, Dr. Kazdan opined that plaintiff's "back" was "doing better," and her depression was "better," with her mood reported as "stable."  *Id.*  Dr. Kazdan did not opine that plaintiff was experiencing any pain or difficulty moving.  *Id.*

On June 2, 2012, plaintiff was seen by Dr. Arbaugh.  (Tr. 709)  The therapist completed a form on which he indicated plaintiff was experiencing "minimal or no

symptoms or doing fairly well." *Id.* Her mood was "fairly good," as was her appetite, sleep pattern, and energy level. *Id.* Plaintiff told Dr. Arbaugh that she "watches her grandson and does scrapbooking." *Id.* She had "fair" concentration during the therapy session. *Id.* According to Dr. Arbaugh, plaintiff's "anxiety is fairly well controlled." *Id.* Dr. Arbaugh suggested that plaintiff, "tend[s] to be forgetful," but he noted no deficits in her memory. *Id.* Her insight and judgment were rated "fair." *Id.*

Two days later, on June 4, plaintiff was examined by a licensed psychologist, Lenora Brown, Ph.D., regarding both her physical and mental conditions. (Tr. 673) Plaintiff reported that her symptoms of depression were present, "a few hours a day, 3–4 times a week." (Tr. 674) She complained of, "low mood, tearfulness, decreased memory and concentration, poor appetite[,] and disturbed sleep." *Id.* She also said that her "anxiety" leaves her "feeling fidgety," and she described "an inability to focus and panic attacks," the symptoms of which are exacerbated by "novel or unfamiliar situations." *Id.* Plaintiff reported her mood as "[j]ust [k]inda okay." (Tr. 675) She was not taking anti-anxiety medication. (Tr. 674)

Dr. Brown observed "[n]o disturbance in [plaintiff's] gait." (Tr. 675) Plaintiff's judgment and insightfulness were "fair." (Tr. 676) According to Dr. Brown, plaintiff's activities of daily living and social functioning were moderately impaired. *Id.* Plaintiff said that she must take care when lifting because of "back and shoulder pain," and that she "can't lift over 25 pounds." *Id.* She "denied a history of problems getting along with others." *Id.* Plaintiff's concentration, persistence, and pace were within normal limits during the examination. *Id.*

Dr. Brown diagnosed plaintiff with a recurrent, moderate "major depressive disorder" and a "not otherwise specified" "anxiety disorder." (Tr. 677) Dr. Brown remarked that plaintiff's "ability to function in the occupational domain is considered moderately impaired." *Id.* Based on that clinical evaluation, Dr. Brown opined specifically that plaintiff has mild impairments in understanding, remembering, and carrying out simple instructions, and in her ability to make judgments on simple work-related decisions. (Tr. 678) Her ability to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions is moderately impaired. *Id.* Dr. Brown also opined that plaintiff is moderately impaired in her ability to interact with the public, co-workers, and supervisors, and in her ability to appropriately respond to routine work situations. (Tr. 679)

On July 27, 2012, Dr. Kazdan examined plaintiff and observed that plaintiff's depression was "better," and her diabetic sugar levels were "much better." (Tr. 725) She complained of, "[r]ecent back pain with left leg numb[ness]" that "comes and goes." *Id.* Plaintiff was "active, alert, cooperative," "social," "and in no acute distress" during the examination. (Tr. 727) Her neck was normal, as was her skin. (Tr. 728) Her mood was "stable." *Id.* Dr. Kazdan opined that plaintiff's leg symptoms were "not likely from neuropathy," and he noted no changes in her leg conditions. *Id.* She was advised to consult a back surgeon. *Id.*

On August 4, 2012, plaintiff had a therapy session with Dr. Arbaugh, during which he noted that she reported being "anxious to speak," "nervous," "and that she cries when she attends group meetings to support her husband. (Tr. 710) She told Dr. Arbaugh that she was feeling "depressed," but Dr. Arbaugh remarked that

her behavior was "appropriate," rather than "anxious." *Id.* Dr. Arbaugh prescribed the same medications, except he exchanged Abilify for Risperdal, and he recommended continued therapy. *Id.* On September 7, 2012, plaintiff told Dr. Arbaugh during therapy that she was "somewhat anxious" and "worried about her disability case," but she said that her "mood [was] better" on Abilify. (Tr. 711) Plaintiff complained of "some depression on a daily basis" but she estimated that with medications and therapy, "she is about 70% of her baseline mental state." *Id.*

### III.   The ALJ's Decision

In the decision issued on July 23, 2013, the ALJ made the following findings:

1.   Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011.

2.   Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of October 27, 2009, through her date last insured of December 31, 2011.

3.   Through the date last insured, plaintiff had the following severe impairments: diabetes mellitus, status post cervical degenerative disc disease and fusion, status post carpal tunnel surgery, depression, and anxiety.   Plaintiff had the following non-severe impairments: hyperlipidemia, hypertension, and obesity.

4.   Through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Through the date last insured, plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 416.1567(b) except that plaintiff: can sit for four hours at a time up to eight hours in an eight-hour workday; can stand and/or walk for one hour at a time up to three hours in an eight-hour workday; can occasionally reach overhead with both upper extremities; can frequently reach in all other directions; can frequently handle, finger, feel, push, and pull; can frequently operate foot controls with both lower extremities; can occasionally climb stairs and ramps but never climb ladders, ropes, or scaffolds; can frequently balance; can occasionally stoop, kneel, and crouch, but never crawl; cannot be exposed to unprotected heights; can be occasionally exposed to moving mechanical parts and extreme cold; can be

frequently exposed to humidity and wetness, dust, odors, fumes, and other pulmonary irritants; can be frequently exposed to extreme heat and vibration; and can frequently operate a motor vehicle. Finally, plaintiff is limited to unskilled work (simple, routine, and repetitive tasks).

6.      Through the date last insured, plaintiff was unable to perform any past relevant work.

7.      Plaintiff was born on October 27, 1959, and was 52 years old, which is defined as an individual closely approaching advanced age, on the date last insured.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.     Through the date last insured, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

11.     Plaintiff was not under a disability, as defined in the Social Security Act, at any time from October 27, 2009, the amended alleged onset date, through December 31, 2011, the date last insured.

(Tr. 10–30).

## IV.    Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one

of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling

(SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner*, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [the claimant has] done in the past." 20 C.F.R.

§ 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to [her] past relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairments from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

To be entitled to disability benefits under Title II, plaintiff has the burden of showing she was disabled between her alleged onset date of October 27, 2009, and the date she was last insured, December 31, 2011. *Jenkins v. Colvin*, No. 2:12-CV-91-JAR, 2014 WL 1259771, at *2 (E.D. Mo. Mar. 26, 2014); *see also* 20 C.F.R. § 404.130; *Moore*, 572 F.3d at 522; *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" *Cox*, 471 F.3d at 907 (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)). However, to be entitled to Title II benefits, plaintiff must prove she was disabled before her insurance expired. *Id.*

Plaintiff presents the following claims: (1) the ALJ failed to fully develop the record; (2) the ALJ erred when she determined that plaintiff has the RFC to perform

light, unskilled work, with some restrictions; and (3) the vocational expert's assessment that a person like plaintiff could work as a domestic laundry worker or cashier II conflicted with plaintiff's RFC, such that the ALJ erred when she determined other work existed for plaintiff in the national economy.

## A. Developing the Record

Plaintiff first contends the ALJ erred when she "failed to re-contact" plaintiff's physicians. "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citation omitted). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.* (citation omitted). "An ALJ is not required to seek 'clarifying statements from a treating physician unless a crucial issue is undeveloped.'" *Grable v. Colvin*, 770 F.3d 1196, 1201 (8th Cir. 2014) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

The medical records before the ALJ spanned over 700 pages, describing over six years of treatment before, during, and after plaintiff was eligible for coverage. Plaintiff does not expound on her argument by pointing to any relevant medical evidence or test results not covered in those records that would have been material to the ALJ's determination whether plaintiff was entitled to benefits. Therefore, the ALJ did not fail to adequately develop the record.

## B. RFC

Plaintiff next argues the ALJ committed three errors when she determined that plaintiff has the RFC to perform light, unskilled work with some restrictions.

First, the ALJ should have given greater weight to Dr. Kazdan and Dr. Arbaugh's medical source statements. Second, the ALJ erred when she determined that plaintiff's statements regarding the severity of her symptoms were not fully credible. Third, the ALJ failed to adequately account for her finding that plaintiff had moderate limitations in concentration, persistence, and pace.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo*, 377 F.3d at 806.

As explained, the ALJ found that plaintiff has the RFC to perform light, unskilled work with additional restrictions. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10

pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs." 20 C.F.R. § 404.1568(a).

### 1. <u>Medical Source Statements</u>

First, according to plaintiff, the ALJ erred by not assigning greater weight to Dr. Kazdan and Dr. Arbaugh's medical source statements when the ALJ determined plaintiff's RFC.  Dr. Kazdan and Dr. Arbaugh were both treating physicians.

Generally, the Commissioner gives more weight to the opinion of a source who has examined a claimant than a source who has not.  20 C.F.R. § 419.927(c)(1).  When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight.  *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)).  An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to evaluate the record as a whole."  *Cline v.*

*Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (quotation marks and citation omitted). Moreover, an ALJ is "entitled to give less weight to" the opinion of a treating doctor where the doctor's opinion is "based largely on" the plaintiff's "subjective complaints rather than on objective medical evidence." *McDade v. Astrue*, 720 F.3d 994, 999 (8th Cir. 2013) (quotation marks and citation omitted).

An ALJ may not substitute her own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (ALJs may not "play doctor"). However, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (quotation marks and citation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). But, of course, an ALJ is not required to discuss in detail every item of evidence. *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

Here, the ALJ properly credited and relied on the balance of Dr. Kazdan and Dr. Arbaugh's many years of treatment notes related to plaintiff's physical and mental conditions. Plaintiff asserts no error in that regard. However, the ALJ gave little weight to Dr. Kazdan and Dr. Arbaugh's subsequent medical source

statements. (Tr. 26–27) Plaintiff contends it was error to accord those statements little weight.

The Court finds that the ALJ provided substantial evidence to support her conclusion that the medical source statements were entitled to little weight. *Id.* First, as the ALJ explained, those source statements were conclusory forms that consisted of mere checked boxes, without narrative explanation or citation to medical or other evidence to support their conclusions, despite the request for such support. *See McDade*, 720 F.3d at 999–1000 ("[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." (quotation marks and citation omitted)).

Further, those statements were entitled to little weight because they were inconsistent with other evidence of record, including the observations of other treating physicians, such as Dr. Yoon, and examining physicians, such as Drs. Brown, Jusino-Berrios, and London. *See Grable*, 770 F.3d at 1201; *Martise*, 641 F.3d at 927. Those cursory statements were also inconsistent with Dr. Kazdan and Dr. Arbaugh's own treatment notes. *See Davidson v. Astrue*, 501 F.3d 987, 990–91 (8th Cir. 2007) (affirming an ALJ's decision to discount a physician's later opinion on a plaintiff's conditions where the physician's "treatment notes, recorded over the course of two years, contain few hints of the serious physical limitations that [the physician] would later attribute to" the plaintiff). As the ALJ explained, Dr. Kazdan and Dr. Arbaugh's treatment notes repeatedly showed plaintiff's depression was "better" and her mood was "good," and that her physical ailments were controlled on medications and with successful surgical interventions. *See Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015) ("A treating physician's own

inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." (quotation marks, citation, and bracketing omitted)); *Wildman*, 596 F.3d at 964.

The medical source statements were also afforded little weight because they appeared to be based largely on plaintiff's subjective complaints, rather than on objective medical evidence. *See Gieseke v. Colvin*, 770 F.3d 1186, 1188–89 (8th Cir. 2014) (holding a treating physician's opinion is entitled to little weight, even "no weight," where it is "[b]ased almost entirely on" a plaintiff's "subjective complaints"); *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding the "ALJ was entitled to give less weight to [a physician's] opinion, because it was based largely on [a claimant's] subjective complaints rather than on objective medical evidence"). Finally, to the extent the medical source statements opine that plaintiff cannot work, those opinions were entitled to no weight because that question is "reserved for the Commissioner." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."); *Qualls*, 158 F.3d at 428. Consequently, the ALJ was not required to afford the medical source statements greater weight on the basis of the other substantial evidence in the record, and her decision to afford them little weight was not error. Therefore, the ALJ's assessment of plaintiff's RFC is not undermined by that determination.

## 2. **Plaintiff's Credibility**

Plaintiff next contends the ALJ erred when the ALJ found plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Tr. 21) However, she does not fully develop that argument. Plaintiff recounts her subjective complaints of allegedly disabling pain and other symptoms throughout the record, but she does not explain precisely what limitations she complained of that she believes the ALJ failed to fully credit without citing sufficient evidentiary support.

The ALJ's opinion in fact cites substantial medical and other evidence to support the conclusion that plaintiff can perform light, unskilled work with the noted restrictions, and that plaintiff's subjective complaints to the contrary are not fully credible. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors an ALJ must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322); *see McDade*, 720 F.3d at 998 (same). Moreover, a claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski*, 739 F.2d at 1322. "While an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's

subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (quotation marks and citation omitted). "The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledges and examines those considerations before discounting the claimant's subjective complaints." *McDade*, 720 F.3d at 998 (quotation marks, citation, and bracketing omitted). "Because the ALJ is in a better position to evaluate credibility, [a court must normally] defer to his credibility determinations as long as they are supported by good reasons and substantial evidence." *Id.* (quotation marks, citation, and some bracketing omitted).

Consistent with *Polaski* and its progeny, the ALJ cited substantial medical and other evidence to support her determination that plaintiff is capable of performing light, unskilled work, and so she did not fully credit plaintiff's subjective complaints of totally disabling pain and other symptoms. First, the ALJ afforded some weight to plaintiff's description of her symptoms. The ALJ noted that plaintiff "asserted difficulty lifting more than 20 pounds." (Tr. 19) Because that testimony was consistent with the medical and other evidence, the ALJ limited plaintiff to light work. *Id.* Similarly, the ALJ credited plaintiff's testimony that she would be unable to "stand for longer than an hour" at a time, and that limitation was also included in plaintiff's RFC. *Id.* The ALJ additionally credited plaintiff's complaint that she has difficulty, "handling stress and coping with changes in her routine," and the ALJ accordingly limited plaintiff to unskilled work consisting of simple, routine, and repetitive tasks. (Tr. 19–20)

As the ALJ went on to explain, however, plaintiff's activities of daily living were inconsistent with her complaints of debilitating pain and an inability to

function in a work setting.  The ALJ noted that plaintiff testified she could not sit "for more than an hour" and that she said she has difficulty "remembering things, completing tasks, concentrating, understanding, following instructions, [and] using her hands."  (Tr. 19)  But plaintiff then admitted she can manage her personal care independently, that she helps "care for the family pets," and that she can remember to take her medications without reminders.  (Tr. 20)  She also prepares "meals weekly," is capable of "cleaning and doing laundry three to four times a week for one to two hours without help or encouragement," drives and goes out unaccompanied, shops, manages her own finances, reads, goes out to dinner, plays games, visits with family and friends often, and remembers to go places without reminders.  *Id.*  The ALJ also noted that plaintiff's daughter provided a similar description of both plaintiff's daily activities and her limitations.  *Id.*

The ALJ found those activities of daily living were consistent with the medical evidence and inconsistent with plaintiff's subjective complaints of the intensity, persistence, and limiting effects of her symptoms.  (Tr. 21); *see Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (citing *Pulaski* and holding that an ALJ may find that a claimant's credibility is diminished by inconsistencies between her daily activities and her alleged limitations); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (same).

Further, as explained above, the ALJ extensively discussed the medical opinions of record and remarked that years of treatment notes show a lack of

significant restrictions on plaintiff's physical and mental abilities, with notations that she could return to work "without restrictions." (Tr. 24–28) Where a plaintiff's medical records show a lack of significant restrictions imposed by treating physicians, such evidence supports an ALJ's finding of no disability. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006); *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996); *see also* 20 C.F.R. §§ 404.1530, 416.930. Plaintiff also worked for at least a decade after she says her depression began, and she was similarly medicated and in therapy throughout at least some of the period while she was still employed. *See Goff*, 421 F.3d at 792 (finding that a plaintiff's part-time employment for three years after her strokes, "coupled with the absence of evidence of significant deterioration in her condition, demonstrate the impairments are not disabling in the present").

Relatedly, the ALJ explained that plaintiff's treatment records over several years demonstrate that her depression, anxiety, and other psychological conditions remained "stable" with medications and therapy sessions every few months. (Tr. 21–23) The ALJ specifically remarked that there are frequent notations in the record that plaintiff's mood was "good," that her mental conditions were "controlled," and that she was doing "better" or "much better." *Id.*; *see Davidson*, 501 F.3d at 990–91 (explaining that an ALJ is entitled to discount subjective complaints and findings where treatment evidence indicates "no severe restrictions" or where a claimant's conditions are "controlled by medication"); *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) ("[A]n ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.").

Finally, though plaintiff had several surgeries for her herniated discs and carpal tunnel syndrome, the ALJ explained that her complaints of disabling symptoms were further undercut by the success of those procedures. (Tr. 23–28) The records demonstrate that the surgeries were effective at alleviating plaintiff's symptoms; she was "doing good," was "healed," and had "excellent pain relief" after the surgeries, and she repeatedly denied back, joint, or muscle pain. *Id.* "An impairment which can be controlled by treatment or medication is not considered disabling." *Cypress v. Colvin*, 807 F.3d 948, 951 (8th Cir. 2015) (quoting *Estes*, 275 F.3d at 725). Substantial evidence therefore supports the ALJ's determination that plaintiff's subjective complaints of the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record and not fully credible. *See Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014). Consequently, the ALJ did not err when she determined plaintiff's RFC based, in part, on that credibility finding.

### 3. Concentration, Persistence, and Pace

When the ALJ addressed whether plaintiff meets a listing at step 3, the ALJ determined that the evidence of record supports a finding that plaintiff had "moderate difficulties" with regard to "concentration, persistence, or pace." (Tr. 17) In light of that finding at step 3, plaintiff alleges the ALJ "failed sufficiently to consider or account for any need for task redirection or the lack of production quotas, and the like," when the ALJ determined plaintiff's RFC at step 4.

The ALJ limited plaintiff's RFC to unskilled work that requires only simple, repetitive, routine tasks. (Tr. 19); *see, e.g.*, *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014) (finding no error in the RFC determination where, "[d]ue

to a diagnosis of anxiety and depression by a consulting psychologist, the ALJ included other restrictions that essentially limited [the plaintiff] to unskilled work"). Plaintiff does not point to any evidence in the record to demonstrate that plaintiff's moderate difficulties with concentration, persistence, and pace would make her unable to perform unskilled work that is simple, repetitive, and routine. Indeed, the ALJ cited to substantial evidence in the record that plaintiff could perform unskilled work that is simple, repetitive, and routine without further limitations. *See Martise*, 641 F.3d at 926 (explaining that an ALJ's recognition that a plaintiff could only "understand, remember, and carry out simple instructions and non-detailed tasks" credits "serious functional restrictions" that "support the conclusion that the ALJ did not entirely reject" the proffered limitations).

The ALJ first acknowledged that plaintiff reported memory loss and difficulty with task completion, concentration, understanding, and following instructions. (Tr. 19) However, as the ALJ explained, plaintiff admitted, "she was capable of managing her personal care independently; helping care for the family pets; remembering to take her medications without reminders; preparing meals weekly; cleaning and doing laundry three to four times a week for one to two hours without help or encouragement; driving and going out unaccompanied; shopping in stores once or twice weekly for groceries, personal care items, clothing, medications[,] and gifts; managing her finances and counting change; . . . [and] remembering to go places without reminders." (Tr. 20) The ALJ also noted that plaintiff's daughter confirmed the same daily routine and activities, performed without reminders. *Id.* Those activities are inconsistent with such an inability to maintain concentration,

persistence, and pace that additional work restrictions might have been required. *See McCoy*, 648 F.3d at 614; *Roberson*, 481 F.3d at 1025.

Further, the ALJ highlighted that during Dr. Brown's examination she assessed plaintiff's concentration, persistence, and pace as "within normal limits throughout the evaluation." (Tr. 22) The ALJ also remarked that plaintiff had not been pursuing the course of treatment "one would expect for a totally disabled individual," noting specifically that "two to three months or longer" elapsed between many of her therapy sessions with Dr. Arbaugh. (Tr. 25) Plaintiff's credibility when reporting limitations in concentration, persistence, and pace was undercut by, among other things, the fact that she testified she had difficulty reading but both she and her daughter testified that plaintiff reads every day. *Id.*

The ALJ also gave "some weight" to Dr. Jusino-Berrios's opinions as to plaintiff's psychological conditions, which the ALJ found were "consistent with the record as a whole." (Tr. 26) As relevant to plaintiff's psychological functioning, the ALJ emphasized that Dr. Jusino-Berrios found plaintiff had "moderate difficulties in maintaining concentration, persistence[,] or pace," but that she "was capable of understanding, remembering[,] and carrying out simple instructions, maintaining attention, sustaining concentration, persistence[,] and pace, adapting to changes[,] and interacting adequately with others." *Id.* That finding supports the ALJ's conclusion that plaintiff's moderate limitations in concentration, persistence, and pace are adequately addressed by limiting her to unskilled work of a simple, repetitive, routine nature. *See Buckner*, 646 F.3d at 556.

Dr. Brown's review of plaintiff's conditions was given "some weight," including her opinion that plaintiff experiences only "mild difficulties in

understanding, remembering[,] and carrying out simple instructions," and in "making judgments on simple-work related decisions." *Id.* That finding further buttresses the ALJ's conclusion that plaintiff's impairments in concentration, persistence, and pace are sufficiently addressed by limiting her to unskilled work.

Finally, as discussed above, the ALJ cited good reasons to give "little weight" to Dr. Arbaugh's medical source statement. However, as the ALJ pointed out, even Dr. Arbaugh opined that plaintiff has a, "fair ability to understand/remember/carry out simple instructions, follow work rules, relate to coworkers, deal with the public, use judgment, [and] maintain attention/concentration." *Id.* That statement lends credence to the ALJ's conclusion that plaintiff's psychological conditions are accounted for by limiting her to unskilled work consisting of simple, repetitive, routine tasks.

Substantial evidence supports the ALJ's decision that limiting plaintiff to unskilled work involving only simple, repetitive, routine tasks adequately captures the concrete consequences of her moderate difficulties with concentration, persistence, and pace. Therefore, substantial evidence in the record as a whole supports the ALJ's determination that plaintiff has the RFC to perform light, unskilled work, with limitations, and the ALJ committed no reversible error when she determined plaintiff's RFC.

### C. Vocational Expert's Testimony

Finally, plaintiff contends "there is an apparent conflict" between the vocational expert's testimony and the DOT. At step 5, the ALJ found that based on plaintiff's age, education, work experience, and RFC, she could perform other jobs

that existed in substantial numbers in the national economy during the time she was eligible for benefits. (Tr. 28–29) The ALJ therefore determined plaintiff was not entitled to benefits. (Tr. 29) The ALJ made that determination based on the vocational expert's testimony, which the vocational expert said, and which the ALJ agreed, was consistent with the DOT and the SCO. *Id.*

In *Moore v. Colvin*, the Eighth Circuit explained that, "[u]nder Social Security Ruling (SSR) 00–4p, the ALJ must 'ask about any possible conflict' between [vocational expert] evidence and 'information provided in the DOT.'" 769 F.3d 987, 989 (8th Cir. 2014) (quoting SSR 00–4p, 2000 WL 1898704, at *2–4 (Dec. 4, 2000)). Here, as in *Moore*, "the ALJ satisfied this requirement by asking the [vocational expert] to confirm the consistency of [his] testimony. However, the responsibilities of the ALJ do not end there." *Id.*

"If there is an 'apparent unresolved conflict' between [vocational expert] testimony and the DOT," the Eighth Circuit has held that an ALJ has an affirmative duty to "'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [vocational expert's] testimony rather than on the DOT information.'" *Id.* at 989–90 (quoting SSR 00–4p, 2000 WL 1898704, at *2–4). "The ALJ is not absolved of this duty merely because the [vocational expert] responds 'yes' when asked if [his] testimony is consistent with the DOT." *Id.* at 990 (citing *Kemp*, 743 F.3d at 633). "A [vocational expert] must offer an explanation for any inconsistencies between [his] testimony and the DOT, which the ALJ may accept as reasonable after evaluation." *Id.* (citing *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014)). "Absent adequate rebuttal, however, [vocational expert] testimony

that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.'" *Id.* (quoting *Kemp*, 743 F.3d at 632). The same framework applies where a vocational expert's testimony conflicts with the SCO. *See id.* at 989 n.2.

Applying those rules in *Kemp*, for example, the Eighth Circuit reversed and remanded a denial of benefits where the ALJ's hypothetical limited the plaintiff to overhead reaching only occasionally. 743 F.3d at 632. The vocational expert in that case testified that the plaintiff could perform the job of a check-weigher, which required, "'constantly' (2/3 or more of the time) reaching." *Id.* at 633 (citation omitted). "In appendix C of the SCO, 'reaching' is defined as 'extending the hands and arms in any direction . . . .'" *Id.* at 632; *see Moore*, 769 F.3d at 989 ("Neither the SCO nor the DOT specifies the direction of reaching for either type of work."). "[T]he ALJ described a claimant who could reach overhead only occasionally," but the "apparent conflict" between that limitation and a job that may require constant reaching in any direction, "was not resolved on the record." *Kemp*, 743 F.3d at 633.

The *Kemp* Court explained, "the ALJ has an affirmative responsibility to ask about any possible conflict between [vocational expert] evidence and the DOT[] and . . . SCO[] on the requirements of a job or occupation before relying on [vocational expert] evidence to support a determination of not disabled." *Id.* "[T]he record [did] not reflect whether the [vocational expert] or the ALJ even recognized the possible conflict between the hypothetical describing a claimant who could reach overhead only occasionally" and the DOT and SCO, which explain that, "a check-

weigher job involved constant reaching." *Id.*   The Eighth Circuit consequently reversed and remanded because, "the Commissioner did not meet her burden, at step five of the sequential evaluation process, of establishing that jobs existed in the economy that [the plaintiff] was capable of performing." *Id.* (citation omitted).

*Moore* and *Kemp* command the same result for the same error here.   In the proceedings before the ALJ, as in *Kemp*, the ALJ "directed that the testimony was to be consistent with information contained in the DOT, and . . . [the] SCO[]; and that if there was an apparent unresolved conflict between the [vocational expert's] testimony and these sources, the [vocational expert] was to explain it and give the source for his explanation." *Id.* at 632; (Tr. 255–58).   The ALJ described a hypothetical claimant of plaintiff's age, education, and work experience, with plaintiff's RFC.   That RFC included restriction to light, unskilled work with, among other things, additional restrictions limiting plaintiff to only "occasionally reach overhead with both upper extremities," to only "frequently reach in all other directions," to only "frequently handle" objects, and to be only "frequently exposed to humidity and wetness."  (Tr. 19, 67, 255–58)

The vocational expert responded that the hypothetical claimant could not engage in plaintiff's past relevant work.   The vocational expert then opined that a person with plaintiff's RFC could work as a "cashier II," which the vocational expert identified as DOT listing #211.462-010, or a "Laundry Worker, Domestic," which the vocational expert identified as DOT listing #302.685-010.   Both jobs are available in substantial numbers in the national economy.  Finally, the vocational expert testified that his opinions were consistent with the DOT and SCO definitions

of both jobs.  The ALJ elicited no further testimony on that point and agreed that those exemplar positions were consistent with plaintiff's RFC.

However, according to the SCO, the position of cashier II requires frequent reaching, potentially in any direction.[1]  Similarly, the position of a domestic laundry worker requires constant reaching, potentially in any direction, constant handling, and constant exposure to humidity or wetness.[2]  "An ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity."  *Grable*, 770 F.3d at 1202.  But here, both positions may require reaching more often than plaintiff is permitted to do so overhead, and the ALJ did not elicit any testimony from the vocational expert to resolve the apparent conflict between those positions, as defined by the DOT and SCO, and plaintiff's RFC.  *See Kemp*, 743 F.3d at 632–33.  Therefore, the vocational expert's testimony was not substantial evidence that jobs existed in the national economy during plaintiff's coverage window that she could have performed.  *See Moore*, 769 F.3d at 990.  Accordingly, the Court must reverse the Commissioner's decision because the "Commissioner did not meet her burden, at step five of the sequential evaluation process, of establishing that jobs existed in the economy that" plaintiff "was capable of performing," given her age, education, work experience, and RFC. *Kemp*, 743 F.3d at 633.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

---

[1] U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* 333 (1993).

[2] *Id.* at 132.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and the matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2016.